UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
ADAM SMITH, FRANK D'ANGELO, and DAWN   :        13cv3888 (DLC)
JASPER,                                :
                    Plaintiffs,        :
                                       :        OPINION & ORDER
          -v-                          :
                                       :
MIKKI MORE, LLC, VINCENT PACIFICO, and :
DARIAN BRAUN,                          :
                    Defendants.        :
                                       :
-------------------------------------- X

APPEARANCES:

For plaintiffs:

Romeo Salta
Charles H. Knull
630 9th Ave., Ste. 405
New York, NY 10036

For defendants:

Frank M. Graziadei
130 Water St., Ste. 10B
New York, NY 10005


DENISE COTE, District Judge:

     Plaintiffs Adam Smith ("Smith"), Frank D'Angelo

("D'Angelo"), and Dawn Jasper ("Jasper") bring this action in

connection with work they performed in support of a line of

haircare products created by defendant Darian Braun ("Braun")

under the brand name "Mikki More" (the "Mikki More Products").

Plaintiffs have sued Braun, his former partner Vincent Pacifico

("Pacifico"), and their company Mikki More, LLC for, among other

things, misappropriating labels, marketing materials, and a website that plaintiffs created for the Mikki More Products in exchange for payment they never received.  The parties have crossed-moved for summary judgment.  For the reasons stated below, plaintiffs' motion is granted in part and defendants' motion is denied.

BACKGROUND

I.   **The Parties' Failure to Abide by Local Rule 56.1**

The parties' factual disputes are difficult to parse here because the parties failed to follow the Southern District's Local Rules (the "Local Rules").  Local Rule 56.1 requires a party moving for summary judgment to submit a short and concise statement, in numbered paragraphs, of the material facts as to which that party contends there is no genuine issue to be tried.  Local Rule 56.1(a).  A party opposing a motion for summary judgment is to respond to each paragraph in "a correspondingly numbered paragraph"; each paragraph is deemed admitted for purposes of this motion if not "specifically controverted by a correspondingly numbered paragraph."  Id. at 56.1(b), (c).  If necessary, the opposing party shall offer its own statement of additional undisputed material facts.  Id. at 56.1(b).  The parties' statements, including statements controverting any statement of material fact, must be followed by citation to admissible evidence.  Id. at 56.1(d).

Here, defendants submitted a Rule 56.1 Statement of
Undisputed Material Facts in support of their motion for summary
judgment that largely complied with the rule (the "Statement of
Facts").  Plaintiffs, in response, submitted a single Rule 56.1
Counterstatement of Undisputed Material Facts (the
"Counterstatement of Facts").  The first 89 paragraphs of
plaintiffs' Counterstatement of Facts correspond in some fashion
to the 89 paragraphs of defendants' Statement of Facts.  Where
plaintiffs did not dispute defendants' statement of fact,
plaintiffs simply reproduced that paragraph.  Where plaintiffs'
account differed, however, plaintiffs did not directly engage
with defendants' paragraph.  Instead, plaintiffs simply inserted
a new paragraph about the same topic, even where it did not
directly respond to defendants' paragraph.  For instance, in
their Statement of Facts, defendants assert:

> 17.  In order to try to develop for marketing and
> selling the Mikki More Hair Products, Braun had
> samples made and started designing labels and trade
> dress for the products.  Braun Aff., ¶ 12.

Plaintiffs' response is as follows:

> 17.  D'Angelo showed Braun a picture of a prototype
> "Italian motif" bottle which he had developed with co-
> plaintiff, Adam Smith.  The bottle was black and gold
> and said "Mikki More" on it.  It was D'Angelo's idea
> to put "Mikki More" on the packaging design.  D'Angelo
> Dec. para. 6.

Plaintiffs do not state whether they concede that "Braun had
samples made," and they merely imply that it was D'Angelo and

Smith, not Braun, who "started designing labels and trade
dress."  Defendants' statements of fact are deemed admitted to
the extent plaintiffs have not "specifically controverted" them.
Local Rule 56.1(c).

Following these 89 purportedly responsive paragraphs,
plaintiffs' Counterstatement of Facts includes another 64
paragraphs of additional facts they claim are undisputed.
Defendants filed a Response to the Counterstatement of Facts
(the "Response to the Counterstatement"), responding to each of
the paragraphs in the Counterstatement.  At several points,
defendants respond, "Admitted, but immaterial"; at other points,
defendants decline to state whether plaintiffs' statement is
admitted and instead simply respond "Immaterial," without
citation to the record.  Because these responses do not
"specifically controvert[]" plaintiffs' statement and are not
followed by citations to record evidence, they are deemed
admissions.  Local Rule 56.1(c), (d).

## II.  Relevant Facts

The relevant facts are set out below.  Unless otherwise
noted, these facts are undisputed.

### A.   D'Angelo and Braun Meet.

Plaintiff D'Angelo met defendant Braun in the Fall of 2011.
At that time, D'Angelo learned that Braun had created a hair
balm and planned to market it under the "Rock Care" label and a

"rock and roll graffiti theme."  Braun had created a company,
Rock Care, Inc. ("Rock Care"), through which to operate this
business.

Braun hired plaintiff Smith, a freelance graphic designer
with fifteen years of experience, to design labels, packaging,
and advertisements for the Mikki More Products.  The two signed
an agreement on November 20, 2011, under which Smith was to be
paid $30 per hour in exchange for "[c]onceptual product designs
for Mikki More beauty products to specifications for national
product line."  Smith billed Braun via invoice.  These invoices
show that Smith worked as well on two other design projects for
Braun in the Fall of 2011: a "Carmen Electra Product" and an
"Ariana Grande Product."  Defendants never provided Smith with
employee benefits or treated Smith as an employee for tax
purposes.

Sometime that Fall, D'Angelo learned that Braun needed
money to launch his business.  D'Angelo went in search of
investors, meeting with Jamie Mazzei ("Mazzei"), the owner of
Nubest, a high-end hair salon in Long Island, New York.  Mazzei
liked the product but not the label, telling D'Angelo it would
be a "waste of time" to "show [him] the graffiti bottle again."
D'Angelo relayed this to Braun.

**B.   A New Look**

Braun decided to jettison the "Rock Care" label and create

5

the "Mikki More" brand, named for his girlfriend Michela Moresco ("Moresco"), which would adopt an Italian style.  The parties dispute the genesis of this idea.  D'Angelo claims that he suggested that they "go Italian" and try "something in a black bottle with some gold lettering," because their potential investors were Italian.  Braun claims he independently selected an Italian theme based around Moresco's persona.

Smith designed the Mikki More Products' labels in black and gold, although the parties dispute D'Angelo's and Braun's involvement in that process.  In particular, Smith designed a distinctive double-spiral figure, gold against a black backdrop, which is reproduced here (the "Double Spiral"):



The Double Spiral features prominently in the Mikki More Products' labels, as well as packaging, advertising copy, and other promotional materials.

D'Angelo and Smith aver that Smith designed the label with D'Angelo's input and direction, and that D'Angelo then showed Braun a picture of a prototype.  Braun claims that Smith sent him five designs which he reviewed with Moresco, and that he asked Smith for additional designs based on "a sample" provided by Braun.[1]

### C.    Production Begins and Braun and D'Angelo Reach An Agreement.

After showing this prototype to Mazzei, Braun and D'Angelo contacted a bottle manufacturer and ordered four thousand bottles using Smith's design.  D'Angelo asserts that he paid for this order; defendants deny this, with no citation to the record.

By this time, Braun and D'Angelo had reached an agreement about D'Angelo's role, although the parties dispute its substance.  Braun contends that he gave D'Angelo a 2% interest in the venture and promised D'Angelo 20% "if he could provide investors who would contribute substantial capital."  D'Angelo contends that Braun promised D'Angelo a 20% stake if D'Angelo would "put up the money to launch the Mikki More product and get it off the ground."[2]

---

[1] Braun also claims that he "created" the label while Smith "create[d] the artwork for the labels."  This appears to be a reference to the fact that Braun came up with the name "Mikki More."

[2] Pacifico, for his part, asserts that D'Angelo told him he was

Through a childhood connection of Braun's, D'Angelo met with the principals of Ricky's, a New York chain store interested in distributing the Mikki More Products, in January 2012.  At one such meeting, D'Angelo met Smith in person.  After that time, the two collaborated on the artwork for promotional and advertising material for the Mikki More Products.  D'Angelo claims that Braun was uninvolved because he was in Italy during this time; Braun asserts he went to Italy months earlier and that he "collaborated and took part in the planning and execution of the initial sales through Ricky's."  D'Angelo dealt with the printer and worked with Smith to fine-tune the print ads and posters.

Distribution of the Mikki More Products to spas, salons, and other distributors began sometime in 2012.  Mikki More, LLC filed to register "Mikki More" as a trademark with the United States Patent and Trademark Office on September 21, 2012 and with the Office for Harmonization in the International Market on April 9, 2013.

D'Angelo also owned a pizza shop in Manhattan (the "Pizza Shop").  All Mikki More invoices, artwork, and products were kept at D'Angelo's Pizza Shop.

---

promised a 20% stake "if he raised 'big' money for the venture or got it off the ground."

D.   **The Mikki More Website**

Sometime before January 2012, Braun had hired Steve White ("White") to create Mikki More's website.  Moresco was unhappy with White's work and called it "schematic and heartless."

In February 2012, Braun hired plaintiff Jasper to attend to social media for the Mikki More Products and double as an administrative assistant to Braun.  Braun agreed to pay her $1,200 per month for the first three months and $3,000 per month thereafter, although the two never signed a contract. Defendants never withheld any taxes for Jasper, paid any payroll taxes on her behalf, or granted her any employee benefits. Jasper's work included contacting beauty bloggers, writing content for social media posts, designing art to update Mikki More's Twitter and Facebook pages, and -- of greatest relevance here -- redesigning the Mikki More website (the "Website").  Her work as a personal assistant was carried out in Braun's apartment and office; her social media work was conducted both in the office and on Jasper's own time at home.

Upon hiring Jasper, Braun had White send Jasper the login information for site administration and some photos of the Mikki More Products and glamour shots of Moresco.  Jasper states that these were low-resolution images that could not be used on the Website.  Braun claims he gave Jasper "illustrations" he received from White which Jasper "used in connection to the

website."  Defendants have not produced these "illustrations" or offered any further detail about them.

According to Jasper, she created the new design for the Website using images designed by Smith and D'Angelo.  Frames displaying the Double Spiral appear on the left and right sides of each of the Website's pages.  Braun has stated that Jasper "had no way, whatsoever, creating anything to do with the Web site," but contemporaneous emails between Braun and Jasper reflect that Jasper redesigned the site using artwork from Smith.  Jasper created the Website on her own computer on her own time, at her apartment and elsewhere.

**E.   Disputes Concerning Payment**

Smith created several invoices for his work on "Mikki More Branding."  The first, for $285, is dated November 29, 2011; the second, for $450, is dated January 4, 2012; and the third, for $3,225, is dated May 13, 2012.  Smith also produced invoices for two other projects for Braun: on November 29, 2011, Smith billed Braun $180 for work on "Carmen Electra Product" and $225 for work on "Arianna Grande Product."  In April or May 2012, Smith complained to D'Angelo that he had not yet been paid.  D'Angelo relayed the complaint to Braun.  Smith claims that when he asked Braun for payment, Braun "threatened [Smith with] physical harm."  In an email to Jasper dated May 31, 2012, Braun notes that when Smith "demanded $8000, i told him where he can go with

10

that demand."

By May 2012, D'Angelo himself had invested a significant amount in Braun's venture, although the parties dispute how much.  D'Angelo asserts he had invested approximately $20,000, including amounts to cover Braun's personal expenses.  Pacifico states that D'Angelo told him his investment had only been $8,000.[3]  According to D'Angelo, by June 2012, the Mikki More Products were selling "very well," but D'Angelo was paid "very little" and Braun continually made excuses not to pay him.[4]

Although in February 2012 Braun agreed to pay Jasper $1,200 per month for the first three months and $3,000 thereafter, Jasper states that she only received $1,000 from Braun.  When Jasper asked for the remainder of the funds, she claims Braun "stood over [her] in a physically intimidating, menacing and threatening manner."  On May 9, 2012, Jasper emailed Braun to advise that she had "stopped working on Mikki More projects" because of Braun's failure to pay her.

---

[3] In his declaration, Braun does not address the amount of D'Angelo's investment, instead asserting only that "D'Angelo was not owed $20,000 for my personal expenses" and that he paid D'Angelo back $1,800 for covering those expenses.  (Emphasis added.)  Plaintiffs assert in their memorandum of law that D'Angelo's investment was "nearing $50,000" in early June 2012, but this is not asserted in plaintiffs' Rule 56.1 Statement nor is it supported by D'Angelo's declaration.

[4] Defendants dispute this, but cite only to Braun's statements about the cost per bottle.

Braun asserts that plaintiffs, including D'Angelo, were "fully compensated for their services by Rock Care Corp." Defendants have produced the "check register" for Rock Care, which shows that Jasper received $500 on April 1, 2012 and $500 on April 2; that Smith received $250 on April 3, 2012; and that D'Angelo received $1,000 on a date not indicated.  No other payments to plaintiffs are reflected in the check register, and defendants offer no other evidence of payments to plaintiffs.

**F.   Hahn is Hired.**

At some point in early 2013, Smith refused to provide Braun with high-resolution versions of images used on the Website, citing Braun's failure to pay him.  In late March 2013, Braun contacted Troy Hahn ("Hahn"), a graphic designer, to do work in connection with the Mikki More Products.  When the two met, Braun showed Hahn "various pictures, assorted products, and online sites" concerning the Mikki More Products, but told him he did not have the high-resolution files of the logo and designs that appeared on the labels, promotional materials, and Website.  High-resolution files are needed to reproduce these materials.  Hahn asserts that he asked Braun why he did not have these files and that Braun told him "they are in Italy" and "there was a problem" gaining access to them.  Braun denies Hahn ever asked about the high-resolution files.  Braun asked Hahn to create high-resolution copies of the materials he showed Hahn.

Hahn received some of the work to be copied from Joseph Ungoco ("Ungoco"), an associate of Braun's, by email of April 11, 2013.  The file names of those image files include Smith's name.

After Hahn had worked for several weeks without payment, he told Braun he would do no further work until he was paid.  In early May 2013, Braun called Hahn to tell him he could not write a check because he was in Italy but that Hahn would be receiving a check from Mikki More's office in the Bronx.  Hahn then received a check from an office at the Hunts Point Meat Market, which is also where Pacifico has his offices.

**G.    D'Angelo and Braun Fight.**

In early June 2012, D'Angelo and Braun had a physical confrontation in the street.  According to D'Angelo, he confronted Braun near Braun's residence about Braun's failure to pay D'Angelo what he was owed.  D'Angelo states that Braun "lunged" at him, "ready to choke" him, and that he "hit him in self-defense."  D'Angelo claims Braun later called him to apologize and promise him payment.  Defendants dispute this account.  Braun asserts that he never lunged at D'Angelo or tried to choke or hit him.  Pacifico asserts that D'Angelo told him shortly after the event that D'Angelo "had really lost his cool at [Braun] and smashed [Braun] in the face," and that Braun had not tried to hit him at any point.

13

### H.   Enter Pacifico.

On or around June 20, 2012, D'Angelo sought out Pacifico for help.  D'Angelo had known Pacifico since 1978, when D'Angelo was a teenager, as Pacifico was in business with D'Angelo's father.  The two families knew each other well, and D'Angelo saw Pacifico as a mentor.

D'Angelo told Pacifico how he had developed and marketed the Mikki More Products with Braun and about "all of the problems [he] was having with Braun."  He also told Pacifico about the spread between the cost to manufacture ($2) and the retail price (approximately $21).  D'Angelo claims Pacifico was impressed by this; Pacifico denies it.  D'Angelo claims he brought a Mikki More bag and artwork with him, and that Pacifico was impressed with this as well.  Pacifico denies D'Angelo showed him these things, and says he told D'Angelo he was not interested in investing.

D'Angelo also told Pacifico about his recent fight with Braun and asked him to call Braun to make peace.  Pacifico did so.  On that call, Braun spoke to Pacifico about the Mikki More Products.  The two spoke subsequently, and -- without D'Angelo's knowledge -- Pacifico decided he was willing to become involved with the venture.  But Pacifico would only do so if Braun would create a new company and transfer the rights to the Mikki More Products from Rock Care to the new entity.  Braun purportedly

told Pacifico that he owned all rights in the Mikki More Products and could contribute them to the new company.  Braun then claimed to do so, creating Mikki More, LLC.

Pacifico gave Braun $600,000, in exchange for a 50% interest in Mikki More, LLC.  Defendants claim this was a loan, rather than an investment, and that this 50% stake was a "security interest."  Defendants claim that Pacifico's "loan[]" was never repaid, and that Pacifico never received any profits or other other distributions from Mikki More, LLC.  In November 2013, Pacifico surrendered his shares in Mikki More, LLC.

Pacifico asserts that his attorney did some diligence in connection with Pacifico's investment or loan.  Counsel ran a tradename and trademark search and found that "Mikki More" was registered with the U.S. Trademark and Patent Office. Pacifico's attorney also reviewed Moresco's release of rights as to her name and likeness.  Pacifico asserts that he "never had any knowledge or belief that the plaintiffs had created any marketing or advertising material for the Mikki More hair-care products" and in fact "Braun had represented . . . that he was responsible for all of its marketing and advertising and had all of the rights to the Mikki More hair-care products."

In August 2012, D'Angelo discovered that Pacifico had become involved with the venture without D'Angelo's knowledge. D'Angelo claims he called Pacifico, protested that he had been

promised 20% of the venture, and that Pacifico said, "You have nothing.  Next time get it in writing.  Let that be a lesson." Defendants dispute this, but cite only to Pacifico's assertion that "[t]he only thing [he] said to D'Angelo" is that he thought D'Angelo and Braun would be unable to "work things out" after their fight.

### I.   Pacifico's Involvement

Braun and Pacifico state that Pacifico did not manage the affairs of Mikki More, LLC, did not make decisions about payments by Mikki More, LLC, and did not participate in decisions concerning the Mikki More Products' labels, graphics, advertising, or website.  Hahn asserts that once, at Braun's apartment, he was introduced to "an influential business man who had shares in several major companies," whom Braun referred to as his "brother."  This man was "well aware of what [Hahn] was engaged to do and the reason for [his] service" and "even critiqued some of [his] work."  Hahn states that, "based on the information that I have learned since my meeting with this individual, I believe that this individual was Vincent Pacifico."

Pacifico admits that he visited Braun's apartment, but denies ever meeting Hahn.  Braun asserts that Hahn was introduced to Ungoco, an associate who did occasional work for Braun and lived in his apartment building, not Pacifico.

Defendants have not proffered any testimony or declaration from Ungoco.

**J.    Plaintiffs Apply for Copyrights.**

Smith and D'Angelo applied to the United States Copyright Office for registration of copyright in the "text" and "2-D artwork" in certain Mikki More Product materials and received Registration Number VAu 1-137-371, effective April 3, 2013 (the "Graphics Copyright").  The material claimed by the Graphics Copyright registration includes Mikki More Product labels, packaging, advertising copy, and storefront posters (the "Copyrighted Graphics"), most of which prominently features the Double Spiral design.  Jasper, Smith, and D'Angelo applied for registration of copyright in "text" and "2-D artwork" in the Website and received Registration Number VAu 1-137-618, effective April 16, 2013 (the "Website Copyright").

Defendants continued to use the Copyrighted Graphics and the Website after April 2013.  Plaintiffs attach screen-grabs from the Website as of July 2013, as well as Mikki More's Facebook and Twitter pages as of May 2014, contending that defendants have continued to use the 2-D artwork protected by the Graphics Copyright and the Website Copyright.  The screen-grabs from Mikki More's Twitter page, in particular, feature the Double Spiral frames from Jasper's Website.  The screen-grabs from the July 2013 Website show a number of Mikki More labels

17

included in the Graphics Copyright, as well as the following circular figure created from the Double Spiral design:



### K.    Aftermath

In the Summer of 2012, D'Angelo posted an advertisement on Craig's List to "sell some of the [Mikki More Products] that w[ere] left in [his] office."  D'Angelo received a telephone call and then a cease-and-desist letter from defendants' attorneys, and he obliged.  It is not clear whether D'Angelo ever sold any of the Mikki More Products.  Braun avers that "[t]he Mikki More hair care products which Frank D'Angelo sold at his office were not owned by D'Angelo."

Braun avers that "Mikki More, LLC is out of business and the hair care product line is no longer being manufactured or sold" and "has been out of business since December of 2013."  Plaintiffs dispute this.  Jasper states that Mikki More Products "continue[] to be manufactured and sold" in the United States and submits screen-grabs from Mikki More's Facebook and Twitter

pages dated May 11, 2014.  The last post by "Mikki More" on the Facebook page is dated just five days prior, May 6, 2014; the last post by "Mikki More" on the Twitter page is dated October 5, 2013.

### III. Procedural History

On June 6, 2013, plaintiffs brought the instant suit against defendants for infringement of the Graphics Copyright and the Website Copyright, for breach of contract, and for relief on theories of unjust enrichment and quantum meruit.  On January 10, 2014, defendants asserted counterclaims against D'Angelo that allege, among other things, that D'Angelo sold Mikki More Products without permission and consequently infringed and diluted the "Mikki More" trademark (the "Trademark Counterclaims").

Pacifico moved for judgment on the pleadings on February 7, 2014.  On May 9, the motion was granted as to the breach of contract claim against defendant Pacifico and otherwise denied. Fact discovery closed on February 28.  On May 16, defendants all moved for summary judgment on the copyright claims and Pacifico alone moved for summary judgment on the unjust enrichment and quantum meruit claims.  On June 6, plaintiffs cross-moved for summary judgment on each of plaintiffs' claims and on defendants' Trademark Counterclaims.

By letter of June 9, defendants asked the Court to deny

plaintiffs' cross-motion, because it was filed after the May 16 deadline set by the September 20, 2013 Pretrial Scheduling Order.  In the alternative, defendants requested additional time to oppose plaintiffs' cross-motion.  Plaintiffs filed a letter-motion on June 9 requesting that the Court consider the cross-motion, explaining that they did not intend to move for summary judgment until they saw that defendants made certain concessions in their own summary judgment papers.  The Court granted defendants the additional time they requested on June 9, and the parties' summary judgment motions were fully submitted on July 6, 2014.  For the reasons that follow, plaintiffs' letter-motion of June 9 asking the Court to consider their cross-motion for summary judgment is granted, defendants' motion for summary judgment is denied, and plaintiffs' cross-motion is granted as to their claim for infringement of the Graphics and Website Copyrights by Braun and Mikki More, LLC and as to defendants' first and second counterclaims for trademark infringement.

## DISCUSSION

### I.   Plaintiffs' Late-Filed Cross-motion Will Be Considered.

There is good cause to entertain plaintiffs' late-filed cross-motion.  See Fed. R. Civ. P. 16(b)(4).  There is no prejudice to defendants, who were granted the time they requested to oppose; permitting plaintiffs' cross-motion will greatly enhance the efficiency of these proceedings, as it is

meritorious in part; the reason for delay was not within plaintiffs' reasonable control, as they were not aware defendants would make the concessions they did until defendants filed their papers; and plaintiffs have acted in good faith. Accordingly, the Court will consider plaintiffs' cross-motion for summary judgment.

## II.  Summary Judgment Standard

Summary judgment may not be granted unless all of the submissions taken together "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party.  Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992); Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008).  Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings.  Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  Nor may a party "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary

judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). "A submission in opposition to (or in support of) summary judgment need be considered only to the extent that it would . . . be[] admissible at trial." Doe ex rel. Doe v. Whelan, 732 F.3d 151, 157 (2d Cir. 2013) (citation omitted). Only disputes over material facts -- "facts that might affect the outcome of the suit under the governing law" -- will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## III. Copyright Infringement

For the reasons that follow, summary judgment is granted for plaintiffs on their claim for infringement of the Graphics and Website Copyrights against Braun and Mikki More, LLC, but otherwise denied.

### A.   Primary Infringement

To establish direct copyright infringement, a plaintiff must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Artista Records, LLC v. Doe 3, 604 F.3d 110, 117 (2d Cir. 2010) (citation omitted). A certificate of registration made within five years after the first publication of a work is prima facie evidence of the validity of a copyright. 17 U.S.C. § 410(c).

Copyright protection extends only to "original" works. Certificates of registration are also prima facie evidence of the originality of a work.  Boisson v. Banian, Ltd., 273 F.3d 262, 268 (2d Cir. 2001).  Regardless of whether a work, or an element within a work, is "novel or unique," it is "original" if it was "independently created by its author," rather than "copied from pre-existing works," and "comes from the exercise of the creative powers of the author's mind."  Id.

Each co-author of a joint work has an undivided interest in the work.  17 U.S.C. § 201(a).  A putative co-author must show that she (1) "made independently copyrightable contributions to the work" and (2) that all participants "fully intended to be co-authors."  Thomson v. Larson, 147 F.3d 195, 200 (2d Cir. 1998).  This latter condition is "especially important" where one person is "indisputably the dominant author of the work." Childress v. Taylor, 945 F.2d 500, 508 (2d Cir. 1991).  "A person who merely describes to an author what the commissioned work should do or look like is not a joint author."  Gaylord v. United States, 595 F.3d 1364, 1379 (Fed. Cir. 2010) (citation omitted).  "To be an author, one must supply more than mere direction or ideas: one must translate an idea into a fixed, tangible expression entitled to copyright protection."  Id. at 1377 (citation omitted).

When a work is "made for hire," the employer is considered

23

the author of the work and owns the copyright.  17 U.S.C. §
201(b).  In the absence of a written instrument in which the
parties "expressly agree . . . that the work shall be considered
a work made for hire," a work is only "made for hire" if it is
"prepared by an employee within the scope of his or her
employment."  17 U.S.C. § 101.  To determine whether a hired
party is an "employee" within the meaning of Section 101, courts
look to the "the general common law of agency" and so "consider
the hiring party's right to control the manner and means by
which the product is accomplished."  Cmty. for Creative Non-
Violence v. Reid, 490 U.S. 730, 751 (1989).  Other factors
considered include:

> the skill required; the source of the
> instrumentalities and tools; the location of the work;
> the duration of the relationship between the parties;
> whether the hiring party has the right to assign
> additional projects to the hired party; the extent of
> the hired party's discretion over when and how long to
> work; the method of payment; the hired party's role in
> hiring and paying assistants; whether the work is part
> of the regular business of the hiring party; whether
> the hiring party is in business; the provision of
> employee benefits; and the tax treatment of the hired
> party.

Id. at 751-52.  "[N]o single factor is dispositive," and a court
should "disregard those factors that, in light of the facts of a
particular case are (1) irrelevant or (2) of 'indeterminate'
weight -- that is, those factors that are essentially in
equipoise."  Eisenberg v. Advance Relocation & Storage, Inc.,

237 F.3d 111, 114 (2d Cir. 2000).  The Second Circuit has instructed that courts "give[] more weight in the analysis" to five of those factors: "(1) the hiring party's right to control the manner and means of creation; (2) the skill required; (3) the provision of employee benefits; (4) the tax treatment of the hired party; and (5) whether the hiring party has the right to assign additional projects to the hired party." Aymes v. Bonelli, 980 F.2d 857, 861 (2d Cir. 1992); accord Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc., 380 F.3d 624, 636 & n.21 (2d Cir. 2004).  The first factor, the right to control the manner and means of creation, is to be given "the greatest emphasis." Eisenberg, 237 F.3d at 114 (citation omitted).

Ownership of a copyright or an exclusive license can only be transferred by an "instrument of conveyance, or a note or memorandum of the transfer" signed by the owner of the right. 17 U.S.C. §§ 101, 204(a).  A nonexclusive license may be granted orally; it may also be implied from conduct, where (1) the author creates a work at another's request, (2) delivers the work to that person, and (3) intends that that person copy and distribute it.  See Garcia v. Google, Inc., --- F.3d ---, 2014 WL 3377343, at *5 (9th Cir. Feb. 26, 2014); Baisden v. I'm Ready Prod., Inc., 693 F.3d 491, 501 (5th Cir. 2012); Latimer v. Roaring Toyz, Inc., 601 F.3d 1224, 1235 (11th Cir. 2010); Atkins

25

v. Fischer, 331 F.3d 988, 991-92 (D.C. Cir. 2003); Nelson-Salabes, Inc. v. Morningside Dev., LLC, 284 F.3d 505, 514 (4th Cir. 2002); Kennedy v. Nat'l Juvenile Detention Ass'n, 187 F.3d 690, 694 (7th Cir. 1999).  "[D]elivery" of the work by the author to the other party is "not dispositive, but [is] one factor that may be relied upon in determining that an implied license has been granted."  Asset Marketing Sys., Inc. v. Gagnon, 542 F.3d 748, 755 n.4 (9th Cir. 2008) (citation omitted).

Some courts have relaxed this test, focusing on "whether there was a 'meeting of the minds' between the parties to permit the particular usage at issue."  Psihoyos v. Pearson Educ., Inc., 855 F. Supp. 2d 103, 124 (S.D.N.Y. 2012).  Whatever the formulation, courts only imply a nonexclusive license in "narrow circumstances."  SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharma., Inc., 211 F.3d 21, 25 (2d Cir. 2000) (citation omitted).  Such a license is revocable until such time as the agreed-upon consideration is paid, Asset Marketing, 542 F.3d at 757, and even where full payment is a covenant rather than a condition to the granting of the license, "[a] material breach of a covenant will allow the licensor to rescind the license and hold the licensee liable for infringement for uses of the work thereafter."  Graham v. James, 144 F.3d 229, 237 (2d Cir. 1998).

The existence of an implied license is an affirmative

defense to infringement.  Atkins, 331 F.3d at 992.

"[G]enerally, failure to plead an affirmative defense in the

answer results in the waiver of that defense and its exclusion

from the case."  Sompo Japan Ins. Co. of Am. v. Norfolk So. Ry.

Co., 762 F.3d 165, 176 (2d Cir. 2014) (citation omitted).

### 1.  Graphics Copyright

Smith and D'Angelo created the labels, packaging,

advertising copy, and other promotional materials covered by the

Graphics Copyright.  Defendants do not meaningfully dispute

this.  Nor do they deny that Braun, on behalf of Mikki More,

LLC, copied constituent elements of the Copyrighted Graphics --

in particular, the Double Spiral graphic -- on labels and

promotional materials for the Mikki More Products, as well as on

the Website and Mikki More Facebook and Twitter pages, after the

Graphics Copyright was registered, without an assignment of

rights from Smith or D'Angelo.  Instead, defendants argue that

(1) the Copyrighted Graphics was work Smith "made for hire"; and

(2) Braun was a co-author.

Defendants' first argument fails because no reasonable jury

could find that Smith was an employee rather than an independent

contractor.  Smith was a skilled graphic designer with fifteen

years experience who created the Copyrighted Graphics on his own

computer, in his own home, on his own schedule.  Braun had no

right to control the manner or means of this work.  Graphic

27

design was not part of the regular business of Rock Care or
Mikki More, LLC.  Smith was not given employee benefits, nor was
he treated as an employee for tax purposes.  While it appears
Smith accepted several other projects from Braun, there is no
evidence to suggest that Smith was obligated to accept these
projects.  And while Smith billed by the hour rather than by
project, he submitted requests for payment via invoices.  Smith
was, in many respects, the paradigmatic independent contractor.

Indeed, at one point, defendants agreed.  In their
Statement of Facts, defendants asserted that Smith was "hired
. . . as an independent contractor," and in their opening brief,
they conceded that "the graphics designs and text which
plaintiff Smith created was pursuant to his employment as a[n]
independent contractor."  Defendants only reversed their
position in their reply papers, after reading plaintiffs' papers
and realizing that this concession is fatal to their argument.[5]

As for defendants' second argument, defendants contend for
the first time in their reply memorandum that Braun was a co-

---

[5] In their opening papers, defendants erroneously applied the
Copyright Act of 1909, which grants the copyright of a work
created by an independent contractor to the hiring party if the
work was created at the hiring party's "instance and expense."
See Marvel Characters, Inc. v. Kirby, 726 F.3d 119, 137 (2d Cir.
2013).  It was not until their reply papers that defendants
recognized that the Copyright Act of 1976 governs, under which
Smith and Jasper retain ownership of the copyright if they were
independent contractors.

author of the Copyrighted Graphics.  Defendants' only support is
the fact that Braun provided Smith with the product's name
("Mikki More") and the outline of the marketing story, and he
selected the font Smith used.  Yet these are not independently
copyrightable contributions, and defendants do not even claim
that Smith fully intended that Braun be a co-author, which would
have permitted Braun to use the work regardless of payment to
Smith for his services.  Any reasonable jury would find that
Braun was not a co-author of the Copyrighted Graphics.
Accordingly, there is no genuine issue of material fact
concerning Braun and Mikki More, LLC's infringement of the
Graphics Copyright, and summary judgment is granted to
plaintiffs on this claim as to these two defendants.  Damages
will be determined at trial.

### 2.  Website Copyright

Summary judgment is also granted to the plaintiffs as to
Braun's and Mikki More, LLC's infringement of the Website
Copyright.  As described below, there is no genuine dispute of
fact as to whether Jasper was acting as an independent
contractor when she created the Website.

As an initial matter, defendants argue that they cannot be
liable for infringement because the legend "© 2011-12 Mikki More
L.L.C. All Rights Reserved" appears on only two of nine pages
deposited in support of the Website Copyright.  They cite no law

for this proposition.  Defendants are incorrect; for works created following the effective date of the Berne Convention Implementation Act of 1988, this legend is not required to establish an author's ownership of the copyright.  See 17 U.S.C. §§ 401, 405.  Even before the Berne Convention was adopted, when the governing regime was more technically demanding with respect to the copyright legend, the "validity and ownership" of a copyright were not affected if "the person named in the copyright notice on copies . . . publicly distributed by authority of the copyright owner [wa]s not the owner of copyright."  17 U.S.C. § 406.

This legend might be evidence supporting a theory that plaintiffs granted defendants an implied nonexclusive license to use the Website, but defendants elected not to plead this affirmative defense in their answer, which includes eighteen other defenses.  Nor have defendants raised this argument on this motion.  Consequently, this defense is waived.

In any case, this defense would fail on the merits.  It is not at all clear that any license was ever granted, as Smith refused to deliver the high-resolution versions of the Copyrighted Graphics to Braun due to Braun's failure to pay him.  Even assuming, arguendo, that an implied license had been granted, that license was revoked before the infringing uses of which plaintiffs have submitted evidence, as described below.

No reasonable jury could find that Smith was paid for the Copyrighted Graphics.  Braun's bare assertion that Smith was "paid by [Rock Care] for the graphics, labels, packaging and advertisements which he created for the Mikki More Hair Products" is insufficient to create a genuine issue of fact as to whether Smith was paid in full.[6]  Smith's invoices show he was owed several thousand dollars and Rock Care's check register indicates Smith was only paid $250, a small fraction of that. In a contemporaneous email discussing Smith's request for $8,000 in payment for his work, Braun does not deny that Smith was owed money.  Thus any license was revocable and was revoked by plaintiffs no later than June 6, 2013, the date the complaint was filed.  This predates the screen-grabs of the Website and Mikki More Facebook and Twitter pages that plaintiffs have offered as evidence of infringement, as well as the last posts by "Mikki More" on these pages.

Defendants also argue that the Website is not original, because Jasper used materials created by White.  Braun's vague statement that he gave Jasper "illustrations" he received from White that Jasper "used in connection to the website" does not suffice to rebut the presumption of originality.  Indeed, there

---

[6] The same is true of Jasper with respect to the Website.  Jasper was owed several thousand dollars for her work for Braun between February and May 2012, but she was only paid $1,000.

is no evidence that White himself illustrated anything; it is undisputed that the only "illustrations" used in the Website were created by Smith and D'Angelo.

Nor does a genuine issue of fact exist as to whether the Website was a work made for hire, as any reasonable jury would find Jasper was an independent contractor.  Defendants themselves admitted that "Jasper worked as an independent contractor" in their Statement of Facts.  Likewise, in their opening brief, defendants asserted that "anything which plaintiff Jasper may have created as part of the Mikki More Website Materials was created pursuant to her employment . . . as an independent contractor administrative assistant/social media person."[7]

No reasonable jury could disagree.  Turning to the five factors to be given the most weight in this analysis, four of the five indicate that Jasper was an independent contractor.  As for the first and most significant factor, Braun did not have the right to control the manner or means of Jasper's creation of the Website.  She created the Website on her own computer, in her own home, on her own time.  Jasper's website design required substantial skill, both technical -- graphic design -- and

---

[7] Defendants reversed their position in their opposition to plaintiffs' cross-motion, arguing for the first time that Jasper was an employee.

social media savvy.  Jasper was given no employee benefits, nor did Braun treat her as an employee for tax purposes.

The last factor -- Braun's right to assign Jasper additional projects -- favors defendants.  In addition to her responsibility for managing Mikki More's social media, Jasper acted as a personal assistant to Braun.  She recognized that if she "freed up . . . time" by efficiently completing her social media obligations, she would have "helped [Braun] focus on other areas like running [his] errands or other assistant duties [he] needed" performed.

Two other factors are relevant here.  While Jasper agreed to work for a monthly salary, when she discussed payment with Braun, Braun likened himself to Jasper's other "clients," who Jasper explained paid her a monthly "retainer" or on a "project basis."  And Jasper's website design work was not part of Mikki More, LLC's regular business.

Considered as a whole, and as confirmed by the defendants' admission, no reasonable jury would find that Jasper created the Website as an employee.  Consequently, Braun and Mikki More, LLC are liable for infringing the Website Copyright.  They copied constituent elements of the Website -- in particular, the Double Spiral graphics -- for use on the Website and Mikki More's Facebook and Twitter pages after the effective date of the Website Copyright.  Damages will be determined at trial.

**B.    Pacifico's Liability for Infringement of the Graphics Copyright**

Under common law tort principles, a defendant is liable for contributory infringement if, "with knowledge of the infringing activity, [the defendant] induces, causes or materially contributes to the infringing conduct of another." Artista Records, 604 F.3d at 117 (citation and emphasis omitted). The knowledge standard is objective, and includes persons who "know or have reason to know of the direct infringement." Id. at 118 (citation and emphasis omitted). A defendant with such knowledge is liable where the defendant "engages in personal conduct that encourages or assists the infringement." Id. (citation omitted). In deciding whether liability should attach for certain contributory conduct, courts look to "the function that the alleged infringer plays in the total reproduction process." Id. (citation omitted).

Similarly, a defendant is vicariously liable for infringement where "the right and ability to supervise coalesce with an obvious and direct financial interest in the exploitation of copyrighted materials -- even in the absence of actual knowledge that the copyright monopoly is being impaired." Viacom Int'l, Inc. v. YouTube, Inc., 676 F.3d 19, 36 (2d Cir. 2012) (citation omitted). "Individual officers of a corporation will be vicariously liable for the corporation's infringing

conduct" under these circumstances.  Jonathan Adler Enters., LLC
v. Ins & Outs Pottery, Inc., 12 Civ. 4866 (DLC), 2012 WL
4471540, at *1 (S.D.N.Y. Sept. 26, 2012); accord Softel, Inc. v.
Dragon Med. & Sci. Commc'ns, Inc., 118 F.3d 955, 971 (2d Cir.
1997) (applying this test in analysis of corporation's
president's vicarious liability for copyright infringement by
corporation).

Genuine issues of fact preclude summary judgment for either
plaintiffs or defendants as to Pacifico's liability for
infringing the Graphics Copyright.  Plaintiffs proffer evidence
that D'Angelo told Pacifico of D'Angelo's work for the venture,
particularly the artwork, and that D'Angelo had not been paid,
when the two met in June 2012.  Pacifico then decided to
purchase a 50% interest in Braun's venture, knowing that
D'Angelo had received and would receive almost nothing, but only
after Braun created a new limited liability company.  A jury
could also find that Hahn met with Pacifico at Braun's
apartment, and that Pacifico knew Hahn had been hired to
recreate high-resolution copies of Smith's graphics, which he
was withholding due to lack of payment.  Indeed, a jury could
find Pacifico wrote and mailed Hahn's check.  Pacifico's
continued funding of Braun's venture, with knowledge that he was
furthering Braun's infringement of plaintiffs' rights, would
suffice to establish contributory infringement, if not vicarious

liability for Braun's primary infringement.

On the other hand, Pacifico denies the above, and in particular denies that he had any supervisory authority over Braun or Mikki More, LLC or "any knowledge or belief that the plaintiffs had created any marketing or advertising material for the Mikki More [Products]." Accordingly, factual disputes exist over material facts and summary judgment is denied as to Pacifico's liability for copyright infringement.

## IV.  **Breach of Contract**

Under New York law,[8] a breach of contract claim requires proof of "(1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." Fischer & Mandell, LLP v. Citibank, N.A., 632 F.3d 793, 799 (2d Cir. 2011) (citation omitted).

D'Angelo and Braun dispute the terms of their oral agreement.  Braun contends that he promised D'Angelo a 20% interest in his venture "if [D'Angelo] could provide investors who would contribute substantial capital."  D'Angelo contends that he was to receive the 20% stake in exchange for "put[ting] up the money to launch the Mikki More product and get[ting] it off the ground."  Pacifico, for his part, asserts that D'Angelo

---

[8] Both parties cite New York law in their arguments.  "[W]here the parties agree that New York law controls, this is sufficient to establish choice of law."  Fed. Ins. Co. v. Am. Home Assurance Co., 639 F.3d 557, 566 (2d Cir. 2011).

told him he was promised a 20% stake "if he raised 'big' money for the venture or got it off the ground."  These disputes create issues of fact precluding summary judgment.

Similarly, there are questions of fact as to performance under any version of the contract.  The parties dispute the size of D'Angelo's investment and whether it sufficed to "get [the Mikki More Products] off the ground."  They also dispute the way in which D'Angelo introduced Pacifico to the Mikki More Products, which may determine whether D'Angelo should be credited with raising the $600,000 invested by Pacifico.  Thus, summary judgment is denied as to breach of contract.

## V.   Unjust Enrichment and Quantum Meruit

A plaintiff may recover for unjust enrichment in New York after establishing three elements: (1) the defendant benefitted (2) at the plaintiff's expense, and (3) equity and good conscience require restitution.  Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of NJ, Inc., 448 F.3d 573, 586 (2d Cir. 2006).  Plaintiff need not be in privity with the defendant, but must "assert a connection [with defendant] that [i]s not too attenuated."  Georgia Malone & Co., Inc. v. Rieder, 973 N.E.2d 743, 747 (N.Y. 2012).  "The essential inquiry in any action for unjust enrichment is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered."  Mandarin Trading Ltd. v. Wildenstein, 944

N.E.2d 1104, 1110 (N.Y. 2011) (citation omitted).

Similarly, to recover in quantum meruit in New York, a plaintiff must establish "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005) (citation omitted). Under New York law, courts may consider a plea to recover in quantum meruit "together [with an unjust enrichment theory] as a single quasi contract claim." Id. Because unjust enrichment and quantum meruit sound in quasi-contract, recovery is available only in the absence of an enforceable agreement that governs the same subject matter. Beth Israel, 448 F.3d at 586-87; Mid-Hudson, 418 F.3d at 175.

Here, a reasonable jury could find that an enforceable agreement between Braun and D'Angelo governed D'Angelo's assistance with Braun's venture. For that reason, plaintiffs cannot be granted summary judgment on these claims.

However, should a jury determine that there was no enforceable contract, then plaintiffs would be entitled to damages from Braun, at least, on their quasi-contract claims in an amount to be proven at trial. D'Angelo invested thousands of dollars in the venture that enabled Braun to launch the Mikki

More brand; he participated in the creation of the brand; and
managed the design and printing of labels, packaging, and
promotional materials.  Braun was unjustly enriched by D'Angelo:
he benefitted from D'Angelo's investment of time and money in
the Mikki More brand; this investment was at D'Angelo's expense;
and equity and good conscience would demand restitution.
D'Angelo could also recover from Braun in quantum meruit.
D'Angelo's valuable assistance was provided in good faith, in
the expectation that he would be receiving a portion of the
proceeds from the venture, and Braun accepted this assistance.

Defendants' motion for summary judgment on these claims
against Pacifico is denied for the reasons set out in this
Court's Opinion of May 9, 2014 (the "May 9 Opinion") denying
defendants' motion to dismiss these claims.  A reasonable fact-
finder could find as follows.  Pacifico, having agreed to assist
D'Angelo with Braun, instead betrayed him.  Pacifico, who was
only introduced to Braun and the Mikki More Products because he
had agreed to help D'Angelo, went behind D'Angelo's back to cut
a deal with Braun.  Knowing that the venture was built on
plaintiffs' uncompensated work, Pacifico refused to invest in
Rock Care.  Instead, he engineered the transfer of rights out of
Rock Care -- a corporation in which D'Angelo owned a 2% interest
and was perhaps entitled to a 20% interest -- and into a new
limited liability corporation.  At that point, Pacifico invested

$600,000 to secure for himself 50% of the benefits derived from plaintiffs' work.  Pacifico went on to participate in the scheme to hire Hahn, meeting with Hahn and then writing and mailing a check to him.  In such circumstances, equity would demand accountability.  For the reasons set in the May 9 Opinion, the fact that Pacifico contrived to position himself as a shareholder in an LLC does not vitiate his responsibilities here, which stem from conduct begun before the formation of the LLC and not from his status as a shareholder.  Accordingly, defendants' motion for summary judgment on these claims is denied.

## VI.  Trademark Counterclaims

To establish trademark infringement in violation of Section 32 of the Lanham Act,[9] a party must show that (1) the mark is entitled to protection and (2) the alleged infringer's use of the mark is "likely to cause consumers confusion as to the origin or sponsorship of the [infringer]'s goods."  Tiffany (NY)

---

[9] Defendants fail to state the statutory basis for their federal counterclaims in either their pleading or in their opposition to plaintiffs' cross-motion for summary judgment.  Their second counterclaim includes a reference to Mikki More, LLC's "sole authority to use the name 'Mikki More' . . . under New York Business Law § 360 under [sic] the Federal Trademark Act and Law."  Factually, defendants allege in their counterclaims that D'Angelo sold the Mikki More Products "in violation of [Mikki More, LLC's] trademark," that he "diluted the distinctive quality of its trademark," and that his conduct is "likely to cause confusion in the market place [sic]."

Inc. v. eBay Inc., 600 F.3d 93, 102 (2d Cir. 2010) (citation
omitted).  A claim of trademark infringement under New York law
requires proof of the same elements and can be "analyze[d] . . .
together" with a Lanham Act claim.  Id. at 101 n.6; see N.Y.
Gen. Bus. Law § 360-k.

Federal law also protects against use of a mark or trade
name likely to cause trademark dilution by blurring or
tarnishment.  15 U.S.C. § 1125(c).  Dilution by blurring is an
"association arising from the similarity between a mark or trade
name and a famous mark that impairs the distinctiveness of the
famous mark."  Id. at § 1125(c)(2)(B).  In determining the
likelihood of dilution by blurring, courts may consider all
relevant factors, including the six set out in the statute.
Id.; Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 736 F.3d
198, 207 (2d Cir. 2013).

To prove dilution by tarnishment, a party must show an
"association arising from the similarity between a mark or trade
name and a famous mark that harms the reputation of the famous
mark," which generally occurs when the famous mark is "linked to
products of shoddy quality, or is portrayed in an unwholesome or
unsavory context likely to evoke unflattering thoughts about the
owner's product."  15 U.S.C. § 1125(c)(2)(C); Tiffany, 600 F.3d
at 111 (citation omitted).

New York state law also protects against dilution by

blurring and tarnishment.  N.Y. Gen. Bus. Law § 360-l; Tiffany, 600 F.3d at 111.  The New York law differs somewhat from the federal.  New York law does not require that the mark be "famous" to qualify for protection, and the factors considered to determine the likelihood of blurring differ.  Id.; see New York Stock Exchange, Inc. v. New York, New York Hotel LLC, 293 F.3d 550, 558 (2d Cir. 2002) (setting out factors).

It is lawful to use a trademark "where doing so is necessary to describe [the mark owner]'s product and does not imply a false affiliation or endorsement by [the mark owner] of the [mark user]."  Tiffany, 600 F.3d at 102-03.  "As a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner."  Id. at 103 (citation omitted).

Here, plaintiffs are entitled to summary judgment on defendants' first and second counterclaims, which allege that D'Angelo sold Mikki More Products and misrepresented to distributors of hair products that he was the owner of the "Mikki More" trademark and the Products.  It is undisputed that the Mikki More Products D'Angelo advertised and any products he sold were genuine.  And defendants have offered no evidence from which to infer that D'Angelo's Craig's List advertisement was likely to cause consumer confusion concerning his affiliation with or endorsement by Mikki More, LLC, or tarnish the "Mikki

More" name.  Defendants, in fact, offer no evidence whatever on this point, aside from Braun's bare statement in an affidavit that "[t]he Mikki More hair care products which Frank D'Angelo sold at his office were not owned by D'Angelo."  The only other evidence in the record is D'Angelo's own statements in an affidavit and deposition, in which he avers that he attempted to sell genuine Mikki More Products left in D'Angelo's office by posting a Craig's List advertisement, that he received a cease-and-desist letter from defendants' attorney, and that he complied.  There is no evidence regarding the content of that advertisement -- including whether it even referred to the Mikki More Products by name.

Defendants themselves only offer four sentences in support of their trademark counterclaims and no citations to any statute or legal authority.  Failing to recognize that defendants bear the burden of producing sufficient evidence to support their counterclaims, defendants argue that plaintiffs are not entitled to summary judgment because plaintiffs "failed to offer proof that [D'Angelo] was the owner of the hair care products" or that "he notified buyers and potential buyers that he was not associated with Mikki More, LLC."  Accordingly, they argue, his "sale of Mikki More hair care products . . . would naturally cause confusion as to the source of the products."  In fact, there is no evidence in the record to suggest that D'Angelo sold

a single product.

Because the sale of "genuine goods bearing a true mark" without the authorization of the mark's owner is generally permissible, Tiffany, 600 F.3d at 103 (citation omitted), no reasonable factfinder could find that the mere act of posting an advertisement to sell the Mikki More Products, the content of which is entirely unknown, infringed or diluted defendants' trademark. Accordingly, plaintiffs' motion for summary judgment on defendants' first and second counterclaims is granted.

**CONCLUSION**

Defendants' motion for summary judgment of May 15, 2014 is denied and plaintiffs' cross-motion for summary judgment of June 6, 2014 is granted as to plaintiffs' claim for infringement of the Graphics and Website Copyrights by Braun and Mikki More, LLC and as to defendants' first and second counterclaims for trademark infringement, and otherwise denied.


Dated:     New York, New York
           October 9, 2014

                              _____
                                     DENISE COTE
                              United States District Judge